**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ AUG 03 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JERMAINE RICHARDSON,

                    Petitioner,        03 CV 2061 (SJ)

    - against -               MEMORANDUM AND ORDER

SUPERINTENDENT
of Mid-Orange Correctional Facility,

                    Respondent.
--------------------------------------------------------X
A P P E A R A N C E S :

JERMAINE RICHARDSON, *PRO SE*
DIN 92-A-3686
Mid-Orange Correctional Facility
900 Kings Highway
Warwick, New York 10990

CHARLES J. HYNES, ESQ.
Kings County District Attorney
Renaissance Plaza
350 Jay Street
Brooklyn, New York 11201-2908
By:    Leonard Joblove, Esq.
       Shalom J. Twersky, Esq.
       Assistant District Attorneys
Attorneys for Respondent

JOHNSON, Senior District Judge:

      Jermaine Richardson ("Richardson" or "Petitioner"), appearing *pro se*, has

petitioned this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254 ("§

2254"). For the reasons stated below, the petition for habeas corpus is granted.

## BACKGROUND

Petitioner Richardson was arrested on October 11, 1990 as he was running from the scene of a crime committed at the corner of Utica Avenue and Montgomery Street in Brooklyn, New York. Richardson and co-defendants Robert Hankins, Joseph Moore, and Dwayne Finch were apprehended following an armed robbery in which three individuals, Denzel Coleman, Raul Ruiz, and Stanford Lambert, were shot and robbed. Coleman was killed by a gunshot to the head. Richardson, Hankins, Moore, and Finch were each charged under Kings County Indictment Number 11452/90 with Murder in the Second Degree, in addition to several counts of robbery, assault, reckless endangerment, and criminal possession of a weapon.

### I. Suppression Motions

Prior to trial, the defendants moved to suppress the identification testimony of the People's witnesses, Raul Ruiz and Tacius Pierre-Louis. The trial court held hearings pursuant to United States v. Wade, 388 U.S. 218 (1967), and People v. Huntley, 255 N.Y.S.2d 838 (N.Y. 1965). The first hearing, held on December 13 and 17, 1991 ("December Hearing"), was conducted on behalf of Hankins, Moore, and Finch, but neither Richardson nor his defense counsel, Alan Stutman, was in attendance. (Transcript of Pre-trial Hearing of Dec. 13-17, 1991 ("Dec. 13-17 Tr.") at 3.) Accordingly, the hearing court scheduled a separate hearing for Richardson, which took place on February 24 and 25, 1992 ("February Hearing").

First, New York City Police Detective Wesley Creegan testified that he brought

2

four subjects, Petitioner Jermaine Richardson, Robert Hankins, Joeseph Moore, and Dwayne Finch into the emergency room, one at a time, and presented them separately to each of two witnesses. (Id. at 17-18.) Detective Creegan testified that he first presented Richardson to witness number one, who was later identified as Raul Ruiz. (Id. at 19.) The detective testified that "Witness number one attempted to jump off the stretcher he was on, and he stated, 'that's the mother fuckin' pussy that shot me in the leg and took my gold.'" (Id.) Richardson was then removed from the room and the next suspect brought in. Creegan testified: "Witness number one at that point was in a lot of pain and had no reaction at all." (Id. at 20.) He further testified that after Richardson was removed from the room, "Witness number one was put back on the stretcher. He was quite obviously in pain. And didn't respond any further after that." (Id. at 21.) "Both were in extreme pain, they were laying on stretchers, they had gunshot wounds. After viewing the first individual, witness number one tried to jump off the gurney, as I had testified to before; he became quite enraged; after which he seemed to succomb [sic] to the pain and really had no other response after that." (Id. at 80-81.) Thereafter, neither witness identified any other suspect in the emergency room. (Id. at 20-21.)

Creegan also testified to a subsequent show-up identification procedure at the police precinct: at approximately 12:55 a.m. on October 12, 1990, Richardson, Moore, and Hankins were put together into an interview room at the 71st Precinct. (Id. at 21-22.) Creegan testified that witness number three, who was later identified as Tacius

3

Pierre-Louis, observed the three defendants through the viewing glass and "stated that the smaller man, male black, which was Mr. Richardson, was one of the male blacks shooting at Montgomery Street. And he made clear that Mr. Moore also looked like the guy that shot the guy in the head." (Id. at 22.) Creegan further testified that a fourth witness also viewed the three subjects: "He indicated that the three individuals in the room were the same, were the friends of the fellow that shot Mr. Coleman in the head." (Id. at 23.) Creegan mentioned a fifth witness who also viewed the three subjects and did not identify anybody. (Id. at 25.) He then described his interview with Hankins, in which Hankins stated that he had ridden in a white Saab to Crown street with Joseph Moore and Jermaine Richardson and had remained in the car. (Id. at 27.) Creegan further testified that at approximately 3:38 a.m. on October 12, he conducted a subsequent identification procedure in which he placed Finch into a line-up with five fillers. (Id. at 28.) Witnesses three, four, and five each separately viewed the line-up. (Id. at 29.) Witness five did not make an identification. (Id. at 30.) Witness four identified Finch as being an individual from the shooting. (Id. at 31.) Witness three, Pierre-Louis, also identified Finch: "That guy shot the guy in the head, number three." (Id. at 32.)

Detective Creegan further testified about events later on October 12, when he returned to the hospital and showed two photo arrays to Ruiz. (Id. at 25.) In the first, he showed photos, one after the other, that included Hankins. (Id. at 26.) Ruiz identified Hankins and wrote on the back of the photo array: "Number two, shooting

4

robbing us." (Id. at 37.) In the second photo array, Ruiz identified a photograph of
Finch and wrote: "Number four shooting hood dark hat." (Id. at 38.) Creegan also
testified about a photo array that included Joseph Moore's photograph, in which no
witness made any identification. (Id. at 40, 111.)

Next, New York City Police Officer Michael J. Devine testified that on October
11, 1990 at approximately 11:10 p.m., he and his partner were sitting in an unmarked
police car parked on Crown Street near Utica Avenue. (Id. at 136-37.) He testified that
they heard shots, and then pulled the car forward to the intersection of Utica Avenue,
where he "observed 4-5 male blacks running north bound on Utica Avenue" toward
Crown Street. (Id. at 138.) He observed one person holding a gun, an individual later
identified as Dwayne Finch. (Id. at 139.) He observed Finch throw a gun while he was
running. (Id. at 142, 181, 185-87.) On cross-examination, he testified that he knew it
was Finch who threw the gun because "He was the biggest guy. He was a big guy." (Id.
at 187.) Divine testified that he ordered the runners to stop, and two individuals, later
identified as Petitioner Jermaine Richardson and Joseph Moore stopped, while another
individual kept going. (Id. at 142.) At the time they stopped, they were directly across
from a white Saab double parked in the middle of the block. (Id. at 141-42.) After he
arrested Richardson and Moore, he observed his partner handcuffing Finch, after Finch
had run past the double-parked car. (Id. at 146-47.) He testified that he never lost sight
of the four to five running individuals from the time they turned the corner on to Crown
Street until three of them were arrested. (Id. at 195.) He testified that he saw one

5

individual continue running who was not apprehended. (Id. at 149, 195.)

Devine further testified that after he arrested Richardson and Moore and his partner apprehended Finch, Devine arrested Hankins, who was seated in the rear of the white Saab. (Id. at 147-48.). The hearing court questioned Devine about why he arrested Hankins. Devine testified: "It looked to me [the other suspects] were running towards the white Saab." (Id. at 173.) He testified that he searched the four individuals at the police station and found and vouchered $243 in cash from Moore and a beeper and bloodstained jacket and other clothing from Finch. (Id. at 151-52.) He also testified that Finch had a gunshot wound to his left hand and that he was taken to a hospital. (Id. at 153.)

At the conclusion of the first Wade hearing, the trial court considered whether there was probable cause for the arrest of Hankins, who was found sitting inside the car, found that there was no probable cause, and suppressed all evidence flowing from the arrest. (Id. at 173, 197-200, 202.) The court also opined: "I think Moore has a shot of beating the case, because that testimony, as I recall it, is that everybody said he was standing there, but nobody saw him do anything." (Id. at 201.) Based on this, the court released Moore on his own recognizance. (Id. at 201). However, the court found the identification testimony admissible: "I have no problems with the identification procedures, as far as they were conducted." (Id. at 206.)

On February 24-25, 1992, the same justice held an abbreviated hearing regarding the identification of Richardson, at which both Detective Creegan and

6

Officer Devine testified again, with minor variations in their testimony. Devine

testified that he was patrolling in the 71st Precinct in Brooklyn as part of a plainclothes,

anti-crime patrol at about 11:10 p.m. on October 11, 1990, when he heard gunshots.

(Transcript of Pre-trial Hearing of February 24-25, 1992 ("Feb. 24-25 Tr.") at 344.) He

stated that he looked down Utica Avenue and saw four to five male blacks running.

(Id. at 345.) He testified that he chased several individuals and ordered them to stop.

(Id. at 346). He further testified that Richardson and another individual stopped when

commanded and were apprehended near a white Saab double-parked in the street. (Id.

at 346-47, 361-62.) He testified that another officer, his partner, arrested a third

person, later identified as Finch. (Id. at 358). A fourth individual ran away and was

not apprehended. (Id. at 359, 361). He testified that he did not lose sight of them (id.

at 357, 358), and that he did not observe anything in Richardson's hands (id. at 358),

nor find anything on his person when he patted him down (id. at 362).

Creegan testified that shortly after the incident, he brought four individuals,

including Richardson, into the hospital emergency room, escorted by two plainclothes

officers. (Id. at 305, 324.) Richardson was the first to be shown to the witness later

identified as Ruiz. (Id. at 305.) Creegan testified that Ruiz jumped off his gurney and

identified Richardson, in colorful language, as the individual who shot him in the leg

and snatched his chain. (Id.) In contrast to his testimony in the prior hearing, Creegan

did not testify that Ruiz was in pain. When defense counsel asked on cross-

examination "Was he alert? Was he in pain? Was he asleep? Was he unconscious?"

7

Creegan answered: "He was alert." (Id. at 320.)

Creegan testified that he returned to the hospital on October 12, showed witness

Ruiz a photo array which included a photograph of Richardson, and Ruiz selected that

photograph. (Id. at 314-16.) Creegan read the notation Ruiz had written on the back of

the photo array: "He asked us was we all using the phone, then pulled a gun and said

'Give me everything you have.' He reached for my chain. I gave to him. Then the

pussy shot me twice in the leg and a bullet grazed my arm." (Id. at 316.) On cross-

examination, Creegan explained why he conducted this second identification

procedure: "at that point [the night before] that individual [Ruiz] had no opportunity to

view any line-ups and he wasn't interviewed due to the fact that he was in pain, being

worked on by the doctors. In order to establish who did what I conducted this

identification procedure and interviewed him." (Id. at 335.)

Creegan next described the official show-up procedure in which Pierre-Louis

and two other witnesses were individually shown three suspects inside a viewing room

with a one-way mirror. (Id. at 307.) Detective Creegan testified that the witnesses

were asked if they recognized anybody (id. at 329), and that Pierre-Louis indicated that

"the smaller of the three individuals, Mr. Richardson was one of the male blacks

shooting at Montgomery Street" (id. at 308). Pierre-Louis also "indicated that a larger

fellow, individual Moore looked like the man that shot the guy in the head." (Id. at

308.)

Creegan also testified to an interview he conducted with Richardson, in which

8

Richardson was read his <u>Miranda</u> rights, signed a waiver of those rights, and gave a statement.   (<u>Id.</u> at 311-312.)   According to the officer, Richardson stated that he had driven with Moore and Hankins in the white Saab to Crown street; that he had gotten out of the car to go to the store; and that he then stopped at the phone and asked if the individual who was on the phone was going to be long.  Creegan testified that "Jermaine said at that point some guys came up and robbed the people there and shot them." (<u>Id.</u> at 312-313.)

At the conclusion of the February Hearing, Richardson's Counsel moved for the suppression of both witness identifications.  First, he argued that the hospital show-up was "highly suggestive." (<u>Id.</u> at 372.)  The prosecutor, Nancy Laxer, countered that the hospital show-up was admissible because it happened within one hour of the incident, that the witness was being treated for gunshot wounds, and that the show-up was necessary because it was an opportunity to eliminate Richardson from suspicion.  (<u>Id.</u> at 376.)

Defense Counsel argued that the show-up in the precinct viewing room was both suggestive, because the three suspects were shown together and without fillers, and unnecessary, because the police had the opportunity to arrange a lineup.  (<u>Id.</u> at 373.)  Counsel requested that those identifications be suppressed and that the court hold an independent source hearing.  (<u>Id.</u> at 373.)  The prosecutor argued that the arranged show-up was not suggestive because "the defense has not met their burden, which is to show by a preponderance that there was suggestiveness on the part of the police

9

officers." (Id. at 378.)  The trial court adopted this standard and found: "there was no suggestion *done on the part of the police officers* in any of these identification processes that occurred." (Id. at 382.)(Emphasis added).  The court concluded that no constitutional violation had occurred and denied the motion to suppress the identification testimony. (Id.)

On March 18, 1992, after the trial was underway and jury selection had already commenced, the Wade hearing was reopened, following the revelation of an accidental show-up of the suspects at the police precinct, prior to witness Pierre-Louis's formal identification of Richardson.  The prosecutor indicated that she had just learned the evening before that witness Pierre-Louis had seen Richardson in the police precinct prior to the formal show-up in which he identified Richardson as one of the perpetrators. (Transcript of Wade Hearing, March 18, 1992 ("March 18 Tr.") at 4.) Pierre-Louis was then called to testify to his presence at the scene of the crime, his arrival at the police station for the purpose of identifying suspects, and his identification of the defendants as the perpetrators of the crime.  Under direct examination by the prosecutor, he testified that when he first arrived at the police station, he saw three men in handcuffs standing near the front desk. (Id. at 9, 16.)  He stated that he immediately recognized one of them as "the little guy" that was on the scene shooting, and that he voluntarily told a uniformed police officer that he recognized him as the shooter. (Id. at 9.)  Pierre-Louis did not know the name of the police officer. (Id. at 12.)  He testified that he was taken to a formal identification

10

procedure within one or two hours following that encounter. (Id. at 18.)

Defense Counsel was precluded from asking any questions regarding the circumstances of the confrontation or whether he had given a prior description of the suspects to the police. (Id. at 19-20, 22-23.) Defense Counsel requested that the police officers be called to testify to the circumstances of the encounter, but this request was denied. (Id. at 26-28.) The Defense moved to suppress the identification as unduly suggestive, because three individuals matching the general description the witness had given of the suspects were seen in the precinct, in handcuffs, and in the presence of police officers. (Id. at 26.) The trial court denied the motion, apparently on the ground that the confrontation was not arranged by the police and that Pierre-Louis's identification at that moment was voluntary and spontaneous: "I'm not going to suppress it. Because the guy said he walked in and immediately told the cops, 'I saw one of the -- this little guy on the scene. . . . Counselor, the man himself said that the officer didn't do anything. I find him to be credible." (Id. at 27, 28.)

## II. Plea Negotiations

The People offered Richardson a plea agreement, in which he was to plead guilty to armed robbery, in exchange for a sentence of 5 to 15 years and cooperation against co-defendant Finch. (Transcript of Pre-trial Proceedings of February 26, 1992 ("Feb. 26 Tr.") at 400.) The Court advised Richardson's father, who appeared in court, that Richardson should consider the offer carefully, considering the amount of time he would likely serve if convicted, but also reminded him: "If he's not a participant then

11

he has no choice except to try to redeem himself by going on." (Id. at 401.) There was also some discussion in the record about Richardson feeling threatened by co-defendant Finch. He told the court: "Just the way if someone do something to me and I'm not around that person doesn't mean that that person cannot hurt. . . . By the time being in there, I found that out." (Id. at 404.) After considering the offer overnight, Richardson tried to enter a plea of guilty on February 27, 1992, pursuant to this agreement. (Transcript of Pre-trial Proceedings of February 27, 1992 ("Feb. 27 Tr.") at 412.) However, during allocution, Richardson maintained that he was just standing there when Finch pulled the gun, and that he had not robbed or shot anyone. (Id. at 415-17.) As Richardson had not allocuted to any crime, the court refused to accept the plea. (Id. at 417.) The court then reminded Richardson that several witnesses had identified him and that it would be their word against his word at trial: "It's my feeling that your explanation as opposed to his explanation, I don't think you stand a 50/50 chance." (Id. at 419-20.) Richardson said: "In order to take the plea, I have to say." (Id. at 420.) The court admonished him to tell the truth. (Id. at 421-22.) Richardson then stated "I went to the store, Dwayne Finch brought out the gun. I took the chain from the kid and ran off." (Id. at 422.) He denied that he shot anybody. (Id. at 423.) At that point, the prosecutor indicated that the plea was not acceptable to the People, because she had two eyewitnesses identifying Richardson as having a gun and shooting the victims. (Id. at 423-25.)

Subsequently, Richardson took a polygraph test in the Office of the District

12

Attorney, and perhaps emboldened by the results,[1] indicated, through counsel, that he could not plead guilty to robbery because "I was not involved in the robbery. I did not know it was going to happen. And I can't take the plea." (Transcript of Pre-trial Proceedings of March 6, 1992 at 3.) The prosecutor then formally withdrew the plea offer. (Id.)

## III. Trial

Trial of Richardson and co-defendants Hankins and Finch commenced on March 11, 1992.[2] The People's case against Richardson consisted of the testimony of a series of witnesses who described the scene of the robbery, several shots fired, the flight of Richardson and all the other individuals, the pursuit by officers who were nearby, and the arrest of Richardson and co-defendants Finch, Hankins, and Moore. None of the physical evidence introduced at trial, including the gun used and tossed by Finch and ballistics evidence recovered from the victims, was connected to Richardson

---

[1] In addition to the references made in the failed plea colloquy, the polygraph was discussed during the trial, outside of the presence of the jury, when Richardson was admonished not to mention the results: "You can't mention about you taking a polygraph test and what the outcome was because we don't accept polygraph test as evidence in this court." (Trial Tr. at 664.) At sentencing, Defense Counsel cited the results as mitigating evidence to promote leniency at sentencing. Subsequently, the District Attorney's office acknowledged the favorable polygraph results in its Appellate Brief, in Footnote 31. (Resp.'s Ex. III, Resp.'s Appellate Division Brief, at 56.) And in an April 9, 2002 post-conviction affirmation, Defense Counsel Alan Stutman reaffirmed that Richardson had taken and passed the test and thereafter indicated that he could not plead guilty because he was innocent of the entire crime. (Respondent's Ex. VII, Resp.'s April 10, 2002 Opposition to the 440.10 Mot.)

[2] The record before this Court does not indicate the outcome of the charges against co-defendant Moore, but it appears that those charges were dismissed or dropped prior to trial. During his cross-examination of Devine, Richardson's Counsel asked "isn't it a fact that Joseph Moore's case was dismissed by this Court?" The State's objection to this question was sustained by the court. (Trial Tr. at 257.)

by any of the witnesses.

Witnesses Ruiz and Pierre-Louis also testified to their identification of Richardson as one of the assailants, and Police Officer Devine and Detective Creegan repeated the evidence they had given at the two <u>Wade</u> hearings, regarding the circumstances of Richardson's arrest and of the identification procedures.

As he had stated in previous hearings, Devine testified that he observed one fleeing individual who was not apprehended. (Trial Transcript ("Trial Tr.") at 166, 235-36, 253, 358.) He testified that other than the gun he saw tossed away by Finch, no weapons, cash, jewelry, or any other items said to be taken during the robbery were recovered, despite searching the vicinity, the white Saab, and the other suspects, including Richardson. (<u>Id.</u> at 238-240, 284.) He also testified that he did not lose sight of Richardson from the time he began chasing him shortly after the shots were fired until he was arrested (<u>id.</u> at 244, 246), and that he did not see Richardson throw any items (<u>id.</u> at 246). He testified that Richardson stopped when he yelled: "Police; stop; don't move." (<u>Id.</u> at 251.)

Devine also testified, on cross-examination, to the show-up procedure in which Richardson was placed in a room and witnesses were directed to view him through a one-way mirror. He acknowledged that he did not place Richardson into a lineup with other people who looked similar to him. (<u>Id.</u> at 257.) However, he did not initially indicate that Richardson was placed into the room along with two other individuals

14

who had also been identified as suspects by the police.[3] During re-cross, Devine

acknowledged that the show-up included other people who had been apprehended. (Id.

at 283.) Before Defense Counsel could pursue this line of questioning further, the court

sustained the State's objection as beyond the scope. (Id. at 283.)

Next, Detective Creegan testified that he was called to investigate a shooting

incident on October 11, 1990. (Id. at 288.) He testified that he brought each of the

apprehended suspects into the emergency room and individually showed them to

shooting victims Ruiz and Lambert, while they were being treated. (Id. at 289-90.) He

testified that Ruiz was suffering from a gunshot wound to the leg. (Id. at 289.) On

cross-examination, he testified that Ruiz appeared to be conscious and alert, but in pain

(id. at 300), and that he had come out of the ambulance just minutes before (id. at 300-

01, 302). Richardson was brought in by two plainclothes officers, but Creegan could

not recall if they were wearing badges or other identification (id. at 304), where they

stood in relation to Richardson, or whether Richardson was handcuffed (id. at 306).

Defense Counsel attempted to ask Creegan if Ruiz was in too much pain to continue

with the identification, but the People's objection to that question was sustained. (Id. at

308.)

---

[3] Because the Trial Court had previously found no probable cause for the arrest of Hankins, any
testimony regarding his participation in any identification procedure following his arrest was
precluded under the "fruit of the poisonous tree" doctrine. (Dec. Tr. at 197-98; id. at 134-54.) This
omission, required in order to protect Hankins' rights at trial, may have had a prejudicial effect on
Richardson, because the actual circumstances of the procedure were not known to the jury, and yet
the jury was tasked with assessing the validity of the procedure and the credibility of the
identification testimony that came out of it.

15

Creegan also testified to the show-up in which Richardson and an unspecified number of other individuals were placed in a room and viewed by witnesses through a one-way mirror. (Id. at 291.) He testified that Finch was placed in a lineup. (Id. at 292.) Finch's Counsel cross-examined him about the identification procedure involving Finch, but Richardson's Counsel did not question Creegan about the identification procedures involving his client.

Later, witness Ruiz testified before the jury that he was standing near the pay phone with Coleman, Lambert, and "Shaka" when a "light-skinned, short, skinny" individual of about 16 years of age approached and asked were they all on the phone together. (Id. at 380.) Ruiz identified Richardson as this individual. (Id. at 381.) He testified that two other people then approached. (Id. at 382.) Ruiz identified those two individuals as Hankins and Finch. (Id. at 384-85, 388.) Ruiz testified, "Richardson told me to give him my chain, and then he reached for it." (Id. at 383.) He further testified that Richardson was unsuccessful at taking his chain, but that Finch reached over and snatched it. (Id. at 387.) When he first described the events during his direct testimony, Ruiz mentioned only the gun held by Finch. However, on cross-examination, Ruiz testified that Richardson had a gun in his hand. (Id. at 493.) "It was a handgun. I can't describe it, but it was a dark metallic handgun he had in his hand." (Id. at 493.) Defense Counsel then impeached him with his grand jury testimony in which he indicated that "[it] was a big gun that he had in his hand, it was a machine gun." (Id. at 495.) Ruiz also testified that after the robbery and after Finch shot

16

Coleman in the head, Richardson and Hankins ran in a different direction than Finch. (Id. at 388-89, 398, 402, 406.) Ruiz testified that the area was well-lit by a streetlight overhead (id. at 377) and that he had a very clear view of all three individuals during the robbery (id. at 390, 391, 392-93).

Ruiz also identified Hankins as one of the individuals who participated in the robbery. (Id. at 385, 387.) He claimed he was certain of his identity, because "[h]e was right under the streetlight and I saw his face" (id. at 393), and "I figured it's six and a half feet exactly" from where he stood (id. at 456). At trial, Ruiz indicated that Hankins had not shot anybody (id. at 457), but Hankins's counsel impeached Ruiz with his grand jury testimony in which he said that the person who took the money had carried a gun (id. 459), and that all three co-defendants were shooting at all of the victims (id. at 462).

Ruiz also testified to the details of the hospital show-up in which he had identified Richardson as the individual who shot him. (Tr. at 408-09, 463.) He testified that after he identified Richardson, he was in pain (id. at 409, 468, 488) and was given painkillers that made him sleepy (id. at 409, 463, 489). Thereafter, he testified, he turned his head away from everything. (Id. at 410.) He also testified that he identified Richardson's photo from a photo array the next day in the hospital. (Id. at 496.)

Witness Pierre-Louis also testified at trial. He testified that on the evening of October 11, 1990, he was waiting to use the phone and that the area was well

17

illuminated by a streetlight on the corner. (Id. at 541.) He described the arrival of three

individuals together. (Id. at 543.) He described a tall, heavy-set individual who

grabbed Coleman, whom he identified in court as Defendant Finch. (Id. at 549.) He

also described an individual who grabbed Ruiz as "a little fellow," a "young kid,"

whom he identified in court as Richardson. (Id. at 549-51, 557.) He indicated that he

did not remember anything about the third individual, except that he was about the

same size as himself. (Id. at 551-52.) Although he was the closest to this third

individual, he indicated that he did not get a good look at him. (Id. at 553.) He

testified that when the individuals announced a hold-up and said "nobody move," that

at first he just stood there. (Id. at 579.) He testified that when the third individual tried

to put him and two other guys against the wall, he skipped under the arm of the third

individual and stood a few steps away, with his arms crossed, observing the scene. (Id.

at 554-56, 579.) He testified that Richardson shot Ruiz. (Id. at 557, 580.) Pierre-Louis

further testified that when he heard shooting, he started running away. (Id. at 560,

573.) Under cross-examination, he testified to being very frightened during the

incident: "I couldn't – I don't know what to do, I couldn't move." (Id. at 573.)

However, he also testified that he was "kind of relaxed, I should say, observing." (Id.

at 577.)

Pierre-Louis further testified that after the incident and the arrival of the police

officers, he identified himself as a witness and followed officers to the precinct. (Id. at

563, 585.) He testified that when he arrived at the police station he observed three

18

males handcuffed and standing by the captains' desk, and that he told the officer "the little guy, he's the one that – I recognize that little guy, he's the one that shot one of the fellow [sic]. . . . the one with the jewelry." (Id. at 564.) On cross-examination, he testified that he was not expecting to see the people when he entered the precinct, but that in fact he did see Richardson, standing in handcuffs in the presence of police officers. (Id. at 586.)

He further testified that he was then asked to view some people through a one-way mirror, and that he first identified one person, later identified as Moore, who "may look like the one that shot the guy on the phone. . . . Then I saw another fellow, which is a little guy, then I pinpoint, I said, yes, that's him that shot the guy with the jewelry." (Id. at 565-66.) He stated that this procedure took place less than one hour after he observed the three individuals in handcuffs. (Id. at 588.) He testified that he did not tell the officers conducting that procedure of his previous confrontation with the suspects. (Id. at 588.) Later that same night, he testified, he was asked to view a lineup, in which he identified the individual in position three, Finch, as "the guy that shot the guy on the phone." (Id. at 567.)

Richardson testified in his own defense at trial. Prior to testifying, and outside of the presence of the jury, he was warned that he could not mention the results of the polygraph test that he had taken. (Id. at 664.) He told the jury that on the night of October 11, 1990 he had been out with his cousin, Robert Hankins, and a friend, Joseph Moore, in Moore's white Saab. (Id. at 668-69.) He testified that they stopped so that

19

he could use the telephone to call his mother. (Id. at 671, 673.) He indicated that he was alone as he approached the phone. (Id. at 678, 690-91.) He testified that he approached the payphone, saw people waiting, inquired as to how long they would be on the phone, and stepped back to wait his turn. (Id. at 673-74.) He testified that he did not notice the faces of any of the individuals who were waiting. (Id. at 710.) He further testified that two individuals then approached from behind him, said "don't move" and pulled out a gun. (Id. at 674.) On cross-examination, he indicated that the two individuals appeared to be the same height and explained that "[e]verybody to me is tall because I'm short." (Id. at 712.) He testified that one of the individuals had a small gun and one had a big gun. (Id. at 711-12, 722.) He indicated that when he heard the first gunshots, he ran away toward the car. (Id. at 674-75, 677, 723, 728-29.) He further testified that he noticed other people running, but that he was not aware that they were running in the same direction. (Id. at 677.) According to his testimony, when he heard the police command him to stop, he stopped (id.) and was arrested (id. at 681). He testified that the officers searched his person, but did not find anything on him. (Id.) He denied that he attempted to rob or shoot anybody. (Id. at 691-92.) Under cross-examination, he testified that he did not know who any of the other runners were and that he did not know that Moore had exited the car until he saw him being arrested. (Id. at 730-32.)

He also testified to the circumstances in the police station, including standing at the front desk for five to ten minutes (id. at 684-85), writing a statement (id. at 685-86,

20

687-90), and being asked to stand up inside a room, and then standing up between the two much taller individuals, Hankins and Moore (id. at 686-87).

In summation, Defense Counsel argued that Richardson was at the scene of the crime only as an innocent bystander, and summarized the evidence in support of that theory: the placement of the parked car, at considerable distance from the crime, indicated that it wouldn't have been planned as a getaway vehicle (id. at 838); there was no physical evidence connecting Richardson to the perpetrators, such as a weapon or proceeds from the robbery, and no opportunity for him to toss anything aside while fleeing from the scene (id. at 845-46, 853); and Richardson made a spontaneous and complete initial statement to police, immediately after the incident (id. at 837), that was consistent with his trial testimony (id. at 853-54).

Counsel also highlighted the suggestiveness of the identifications made by Pierre-Louis and Ruiz, given that the suspects were handcuffed and surrounded by police officers, and Richardson's placement as the smaller individual between two taller people. (Id. at 840-43.) He argued that the identifications were also unreliable, given Ruiz's pain during the show-up (id. at 840) and Pierre-Louis's fear during the encounter (id. at 855). Furthermore, he suggested that the witnesses were likely misidentifying Richardson as the perpetrator, because they remembered the last face they had seen before the perpetrators approached. (Id. at 840, 841, 844.) Defense Counsel also questioned why the police put Finch into a lineup, but did not put Richardson into a lineup, and suggested that they were afraid they had the wrong guy,

since there was no prior description of the perpetrators or of the guy who got away. (Id. at 844-45.) Counsel further highlighted the inconsistencies in Ruiz's testimony, including the direction of the perpetrators' flight. (Id. at 847.) Finally, Counsel proposed an alternate theory of events, in which the other perpetrator or perpetrators, including the second gunman, was the individual who failed to stop when commanded by the police, or the individuals Ruiz had testified had run in the other direction, a theory that also explained why the second gun and the stolen jewelry and money were never recovered. (Id. at 852.)

The State argued on summation that the potential suggestiveness of the identification procedures was irrelevant because Richardson himself admitted that he was at the scene of the crime, and argued that this admission made the identifications more, not less, reliable. (Id. at 877-78, 885.) Nonetheless, the prosecutor did not concede that the procedures were suggestive. (Id. at 879.) She also vouched for the reliability of the identifications, arguing that the witnesses had no motive to lie, had sufficient opportunity to view the perpetrators, and gave consistent descriptions of the scene and the course of events, up until the point at which everybody fled. (Id. at 868, 876, 881.) She explained the inconsistency regarding the direction of flight as the witnesses' lack of attention to the flight, given that they had just been part of a robbery and a shooting. (Id. at 874.) She also attempted to attack Richardson's credibility on the ground that he was an interested witness and had a motive to lie, although Defendants' objections to this argument were sustained by the Trial Court.

At the conclusion of the State's case against Richardson, and again after the Defense rested, Defense Counsel moved to dismiss each count of the indictment. (Id. at 658-59, 772.) The court dismissed Count 16, as to Robbery in the First Degree of Sheldon Morris (id. at 651), but denied the other motions (id. at 773).

On March 27, 1992, Richardson was convicted by a jury on all 14 remaining counts, including Murder in the Second Degree. Co-Defendant Finch was also convicted on all counts. Co-Defendant Hankins was found not guilty on all counts. Thereafter, on April 20, 1992, Richardson was sentenced to 15 years to life on the murder conviction and to several additional concurrent terms.

## IV. **Post-Conviction Proceedings**

Richardson appealed his conviction, with new appellate counsel, raising three claims: that the trial court's jury charge on acting in concert was improper, that the identification testimony of witness Pierre-Louis was improperly admitted, and that Richardson was entitled to specific performance of the initial plea bargain because the prosecutor had reneged on a plea offer. (See Respondent's Exhibit II, Brief for Defendant-Appellant.) The Appellate Division of the New York Supreme Court, Second Department, affirmed the conviction on February 21, 1995. People v. Richardson, 622 N.Y.S.2d 966 (N.Y. App. Div. 2d Dep't 1995). The Court of Appeals of New York denied his application for leave to appeal on April 28, 1995. People v. Richardson, 85 N.Y.2d 942 (N.Y. 1995).

On September 29, 1993, Richardson filed a motion to vacate judgment with the

23

trial court, pursuant to New York Criminal Procedure Law § 440.10 ("§ 440.10"),

alleging newly discovered evidence in the form of an affidavit from Dwayne Finch

asserting that Finch had never met Richardson prior to October 11, 1990, had not told

him that he possessed a gun, and had not planned with him to commit a robbery.

(Def.'s Sept. 29, 1993 § 440.10 Motion; Resp.'s Ex. I.)  This motion was apparently

denied, in an oral decision, on November 25, 1993,[4] but Richardson did not receive

formal notice of this denial until a Memorandum Decision and Order with formal

Notice of Entry was filed on December 11, 2001.  (See Resp.'s Ex. IV, V.)  Richardson

then sought leave to appeal, which the Appellate Division, by Justice John M.

Leventhal, denied on July 3, 2002.  (See Respondent's Ex. VII.)

    On January 23, 2002, Richardson simultaneously filed both a Motion to Vacate

Judgment, pursuant to § 440.10 and an application for a writ of error coram nobis.  The

application for the writ of error coram nobis sought review on the grounds that the

People failed to establish probable cause for his arrest; that the People failed to

establish defendant's guilt of felony murder; that the court's instructions on the

requisite elements of felony murder were erroneous; that trial counsel was ineffective

for failing to preserve certain issues for appellate review; and that appellate counsel

was ineffective for failing to ask that Footnote 31, which mentioned the polygraph test,

be stricken from Respondent's Appellate brief.  (See Resp.'s Ex. IX.)  The Appellate

---

[4] Richardson points out that November 25, 1993 was Thanksgiving Day, a day the court was not open.

24

Division denied the writ on May 13, 2002. <u>People v. Richardson</u>, 741 N.Y.S.2d 899 (N.Y. App. Div. 2d Dep't 2002). The Appellate Division specifically rejected the claim of ineffective assistance of appellate counsel, citing <u>Jones v. Barnes</u>, 463 U.S. 745 (1983) (Appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by defendant), but did not address the other claims.

Richardson's second § 440.10 Motion to Vacate alleged that the prosecutor reneged on a promise to allow defendant to plead guilty to lesser charges, if he passed a polygraph test, and alleged that trial counsel was ineffective for failing to raise this issue on the record. That motion was denied on June 3, 2002, on a finding that the claim was procedurally barred because it should have been raised in prior motions. Furthermore, the court found that the claim was without merit. Leave to appeal was denied on December 9, 2002. (<u>See</u> Resp.'s Ex. VII, VIII.)

Richardson filed the instant petition for habeas corpus in federal court on April 28, 2003. Initially, this Court directed Petitioner to show cause why the petition should not be dismissed as time-barred by the statute of limitations imposed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). In response, Petitioner submitted an affirmation explaining the lengthy delay in receiving official notice of the denial of his first § 440.10 Motion to Vacate and asserted that such delay constituted extraordinary circumstances that justified tolling the statute of limitations. Thereafter, the Court directed the Respondent to address the merits of Petitioner's claims.

25

Petitioner's instant application claims the following grounds for relief: (1) the prosecutor committed misconduct by reneging on an alleged promise to renew an offered plea agreement if petitioner passed a lie detector test; (2) he was denied the Sixth Amendment right to the effective assistance of counsel because trial counsel failed to preserve for collateral review matters related to the probable cause for arrest, the absence of evidence that petitioner had acted in furtherance of the killing, and the alleged misconduct of the prosecutor in summation; (3) the trial court erred in admitting the evidence of the suggestive identification in the police station; (4) the trial court's supplemental jury instruction in response to the acting in concert charge was improper; and (5) he was denied the effective assistance of appellate counsel because counsel failed to raise a claim regarding probable cause for arrest and failed to object to an inaccurate footnote and non-record reference in Respondent's appellate brief.

## DISCUSSION

### I. Procedural Issues

The Antiterrorism and Effective Death Penalty Act established a series of procedural requirements for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a State court judgment.

### A. Timeliness

The first line of inquiry is whether the petition is timely under AEDPA's one-year statute of limitations for filing a petition. In most cases, the limitations period runs from "the date on which judgment became final by the conclusion of direct review

26

or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). A conviction becomes "final" when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." Clay v. United States, 537 U.S. 522, 527 (2003). Petitions filed after the enactment of AEDPA but challenging convictions entered before its effective date were granted a one-year grace period following the effective date of the AEDPA, until April 24, 1997, in which to file a habeas corpus petition. Ross v. Artuz, 150 F.3d 97, 103 (2d Cir. 1998).

If a "properly filed" application for State post-conviction or other collateral review with respect to the judgment of conviction was pending at any time during that one-year period, the time during which this application was pending does not count toward the one-year period. 28 U.S.C. § 2244(d)(2). Moreover, the AEDPA statute of limitations is not jurisdictional and may be equitably tolled. Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir.) (per curiam), cert. denied, 531 U.S. 840 (2000). "Equitable tolling, however, is only appropriate in 'rare and exceptional circumstances.'" Smaldone v. Senkowski, 273 F.3d 133, 138 (2d Cir. 2001), cert. denied, 535 U.S. 1017 (2002) (quoting Smith, 208 F.3d at 17). A petitioner "must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." Id.; see also Baldayaque v. United States, 338 F.3d 145, 152-53 (2d Cir. 2003), Valverde v. Stinson, 224 F.3d 129, 133 (2d Cir. 2000).

27

Although Petitioner did not file his habeas corpus petition until ten years after his conviction, the Court nonetheless finds it to be timely under 28 U.S.C. § 2244(d)(1) and (2). As Petitioner did not seek a writ of certiorari from the United States Supreme Court, his conviction became final on July 27, 1995, 90 days after the Court of Appeals denied his application for leave to appeal on April 28, 1995. Since the conviction was entered before the effective date of AEDPA, petitioner had until April 24, 1997 to file his petition. In this case, Petitioner began filing applications for collateral relief before the statute of limitations period even commenced. He asserts that his first § 440.10 motion remained pending from September 29, 1993 until after he finally received a written notice and a formal Notice of Entry of the denial on December 11, 2001 and leave to appeal was denied by the Appellate Division on July 3, 2002. Prior to this final decision, Petitioner had already filed subsequent collateral attacks on January 23, 2002. These two motions were finally decided on May 13, 2002 and December 9, 2002. Accordingly, the Court finds that the statute of limitations was tolled throughout this period, and only began to run on December 9, 2002. Petitioner filed the instant motion on April 28, 2003, 140 days later and well within the one-year period. The application for the writ is timely.

**B. Exhaustion**

The AEDPA also requires that a petitioner exhaust each claim he wishes to raise in federal court by first seeking remedies that may be available in the courts of the state in which he was convicted "or demonstrate that 'there is an absence of available

28

State corrective process [or] [that] circumstances exist that render such process ineffective to protect the rights of the [petitioner].'" Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 808 (2d Cir. 2000) (quoting 28 U.S.C. 2254(b)(1)). The exhaustion requirement mandates that the petitioner "fairly present" both the factual and legal premises of his federal claim to the highest state court. Baldwin v. Reese, 541 U.S. 27, 29 (2004); see also Jones v. Keane, 329 F.3d 290, 294-295 (2d Cir. 2003).

Here, all of Petitioner's claims are properly exhausted and thus subject to federal court review. His claims of prosecutorial misconduct regarding the plea agreement, and the alleged errors of the trial court in failing to suppress the suggestive identification testimony and in giving erroneous jury instructions were each raised in his direct appeal. Petitioner's claims regarding the ineffectiveness of trial counsel and appellate counsel were raised in his second § 440.10 motion and his writ of error coram nobis, respectively.

## C. Procedural Bar – Independent and adequate state grounds

Federal courts conducting habeas corpus review may not consider the merits of federal constitutional claims when a state court has already found those claims to be procedurally barred by "a state law ground that is *independent* of the federal question and *adequate* to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991) (emphases added). The only exceptions to this procedural default may arise if the petitioner can make a showing of cause for the default and resulting prejudice, see Wainwright v. Sykes, 433 U.S. 72, 87 (1977), or can "demonstrat[e] a constitutional

29

violation that resulted in a fundamental miscarriage of justice, i.e., that he is actually

innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d

724, 730 (2d Cir. 2002).

Three of Petitioner's claims were procedurally barred on independent state

grounds. Petitioner raised his claim regarding the trial court's use of a hypothetical

example to supplement the jury charge on acting in concert in his direct appeal. The

Appellate Division found that claim to be procedurally barred because it was

unpreserved for appellate review. Richardson, 622 N.Y.S.2d at 967. Petitioner

presented his claims regarding the alleged prosecutorial misconduct regarding the plea

bargaining and the effectiveness of trial counsel in his second § 440.10 motion to

vacate. The New York Supreme Court found that these claims could have been raised

in his first § 440.10 motion.[5] Accordingly, that court found those issues to be

procedurally barred under New York state law. This Court finds that these three claims

were procedurally barred on independent and adequate state grounds, and thus, they are

likewise defaulted in federal court. Petitioner does not present sufficient cause for his

default, and no "fundamental miscarriage of justice" will result from the "failure to

---

[5] The New York Supreme Court also rejected this claim on its merits, finding that the prosecution has broad discretion to offer, withdraw, or refuse an agreement until such time that it is formally accepted and signed by both parties or entered into the record. If this Court were to consider this question on the merits, it would have to concur with the state court's findings. The record seems to indicate that, following the administration of the lie detector test, it was Petitioner who rejected the plea deal because he stated that he had not committed the crime it described. (March 6 Tr. at 423-25.) The prosecutor does have discretion to bring charges, set the terms of proposed plea agreements, and to take defendants to trial. Accordingly, in this case the prosecutor was within her discretion to continue to prosecute the defendant, without regard to the results of an inadmissible polygraph test.

30

consider the[se] federal claim[s]." <u>Harris v. Reed,</u> 489 U.S. 255, 262 (1989).

Accordingly, the Court will only consider Petitioner's claims regarding the admission

of suggestive identification testimony and the ineffective assistance of appellate

counsel.

## II. **Standard of Review**

In considering Petitioner's remaining claims, the Court must apply the

AEDPA standard of review. Under AEDPA, a federal court may grant a writ of

habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in

state court only if the federal court concludes that the adjudication of the claim "(1)

resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United

States; or (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28

U.S.C. § 2254(d). A state court decision is "contrary to" clearly established Federal

law where "the state court arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law or if the state court decides a case differently

than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams</u>

<u>v. Taylor,</u> 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the

majority in this part). A state court decision involves an "unreasonable application of

clearly established Federal law" where the state court correctly identifies the

governing legal principle from Supreme Court precedent, but unreasonably applies

31

that principle to the facts of the petitioner's case. Id. at 413. The federal court may not substitute its judgment for that of the state court.

Federal claims which have not been adjudicated on the merits are reviewed under the pre-AEDPA de novo standard. Washington v. Schriver, 255 F.3d 45 (2d Cir. 2001). This standard permits habeas relief to be granted if the court finds that a constitutional violation has occurred, and does not require that the court find an unreasonable application of Supreme Court precedent.

## III. Trial Court Error: Admission of Identification Testimony

Petitioner argues that his right to due process was violated by the admission at trial of the identification testimony of witness Pierre-Louis, because that identification was tainted by unnecessarily suggestive identification procedures in the police precinct. Applying the AEDPA standard of review to Petitioner's claim regarding Pierre-Louis's identification, this Court may consider only whether the state courts' findings were contrary to, or involved an unreasonable application of, clearly established federal law. Having carefully reviewed the record, this Court finds that the state courts' findings were contrary to federal law which was "clearly established at the time his state-court conviction became final." Williams, 529 U.S. at 390.

### A. Established Federal Law

The Due Process Clause of the Fourteenth Amendment protects the right of criminal defendants to a fundamentally fair trial. "A defendant's right to due process includes the right not to be the object of suggestive police identification procedures

32

that make an identification unreliable." United States. v. Douglas, 525 F.3d 225, 242 (2d Cir. 2008). "[R]eliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977); see also Neil v. Biggers, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process").[6] Eyewitness identification testimony is not reliable if it is based on an identification procedure that is both

---

[6] Many courts and commentators agree that eyewitness identification is notoriously inaccurate, and yet highly persuasive to juries. See Johnson v. Ross, 955 F.2d 178, 180-181 (2d Cir. 1992) (collecting caselaw and commentary). In Manson, the Supreme Court explained its reasoning in adopting a totality of the circumstances approach rather than a per se exclusionary rule:

> There are, of course, several interests to be considered and taken into account. The driving force behind United States v. Wade, Gilbert v. California, 388 U.S. 263 (1967), and Stovall, all decided on the same day, was the Court's concern with the problems of eyewitness identification. Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress. The witness' recollection of the stranger can be distorted easily by the circumstances or by later actions of the police. Thus, Wade and its companion cases reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability. It must be observed that both approaches before us are responsive to this concern. The per se rule, however, goes too far since its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is reliable and relevant. The second factor is deterrence. Although the per se approach has the more significant deterrent effect, the totality approach also has an influence on police behavior. The police will guard against unnecessarily suggestive procedures under the totality rule, as well as the per se one, for fear that their actions will lead to the exclusion of identifications as unreliable. The third factor is the effect on the administration of justice. Here the per se approach suffers serious drawbacks. Since it denies the trier reliable evidence, it may result, on occasion, in the guilty going free. Also, because of its rigidity, the per se approach may make error by the trial judge more likely than the totality approach. And in those cases in which the admission of identification evidence is error under the per se approach but not under the totality approach cases in which the identification is reliable despite an unnecessarily suggestive identification procedure reversal is a Draconian sanction.

432 U.S. at 111-13 (internal citations and footnotes omitted). This standard balances the efficient administration of justice against the general concern about the unreliability of eyewitness identifications, the possibility of the conviction of the innocent, and the need to hold police officers to a high standard of behavior that adequately protects the rights of suspects.

33

"unnecessarily suggestive," <u>Stovall v. Denno</u>, 388 U.S. 293, 302 (1967) (<u>overruled</u> <u>on</u>

<u>other</u> <u>grounds</u>), and susceptible to "a very substantial likelihood of irreparable

misidentification," <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968).

Where a defendant challenges the admission at trial of eye-witness

identification testimony, the first step is to determine whether the pretrial

identification procedures were unduly or unnecessarily suggestive. A one-on-one

show-up procedure is clearly suggestive, because it suggests to the witness that the

police suspect this person. <u>See</u> <u>Stovall</u>, 388 U.S. at 293, 302 ( "The practice of

showing suspects singly to persons for the purpose of identification, and not as part of

a lineup, has been widely condemned."). "[A] claimed violation of due process in the

conduct of a confrontation depends on the totality of the circumstances surrounding it.

Accordingly, a showup identification violates due process only if it is an *unnecessarily*

suggestive procedure." <u>Brisco v. Ercole</u>, 565 F.3d 80, 88 (2d Cir. 2009) (internal

quotations and citations omitted).

Thus, some suggestive identification procedures may be permitted in the face

of exigent circumstances, such as in the hospital where a victim was believed to be

dying, or at the scene of a crime where police officers are deciding whom to arrest and

whom to release. <u>See</u>, e.g., <u>Stovall</u> (finding a one-on-one hospital show-up to be

"imperative" under the totality of the circumstances); <u>Simmons</u>, 390 U.S. at 384

(suggestive identifications may not be *unduly* suggestive when they happen

immediately following a crime, because they may be "sparing innocent suspects the

34

ignominy of arrest by allowing eyewitnesses to exonerate them"); United States. v. Bautista, 23 F.3d 726, 730 (2d Cir. 1994) ("[A] prompt showing of a detained suspect at the scene of arrest has a very valid function: to prevent the mistaken arrest of innocent persons." (citations omitted)). In such cases, courts have found that the procedures, although suggestive, were not *unnecessarily* or *unduly* suggestive.

After this first step, if the court finds that the procedure was not suggestive or was justified by exigent circumstances, no further inquiry is required. The challenge would be denied, and the identification testimony would be properly admitted into evidence, where the jury could weigh its credibility. Foster v. California, 394 U.S. 440, 442 n.2 (1969) ("The reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury."); Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986) ("[I]f the procedures were not impermissibly suggestive, independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury." (citations omitted)).

However, where identification procedures are found to be unnecessarily or unduly suggestive, the court must determine whether, under the totality of the circumstances, the identification is independently reliable, that is, whether the suggestive procedure resulted in a substantial likelihood of irreparable misidentification. Manson, 432 U.S. at 107. In Neil v. Biggers, the Supreme Court set out five factors to be considered in balancing the suggestiveness of the procedures

35

against evidence of reliability: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." 409 U.S. 188, 199-200 (1972). "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." Manson, 432 U.S. at 114. The Second Circuit concluded that established federal law includes both Manson's general due process standard, "mandating that identification testimony must not lead to the likelihood of irreparable misidentification as a result of impermissibly suggestive procedures," as well as Biggers' "bright-line standard involving certain enumerated factors that needed to be considered in weighing the reliability of some identification testimony." Kennaugh v. Miller, 289 F.3d 36, 44 (2d Cir. 2002). "A good or poor rating with respect to any one of these factors will generally not be dispositive. . . . In each case, the factors must be assessed in light of the totality of the circumstances, and the linchpin of admissibility is reliability." United States v. Concepcion, 983 F.2d 369, 377-78 (2d Cir. 1992).[7]

---

[7] The five Biggers factors have come under criticism from some legal scholars and psychologists, who argue that the factors are insufficiently independent from each other and from the suggestiveness of the identification procedure. See, e.g., Gary L. Wells & Deah S. Quinlivan, Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later, 33 Law. & Hum. Behav. 1, 9 (2009) ("[T]hree of the five Manson criteria, namely, view, attention, and certainty, are what psychological scientists call *retrospective self-reports*, . . . highly malleable in response to even slight changes in context..., the social desirability of the responses, the need to appear consistent, and reinterpretations of the past based on new events."). The individual criteria have also been attacked as unscientific and inaccurate predictors of reliability and accuracy, as discussed below.

The federal standard does not ask whether the suggestive procedure was orchestrated by the police. "The due process focus, in the identification context, is principally on the fairness of the trial, rather than on the conduct of the police. . . . The linchpin of admissibility, therefore, is not whether the identification testimony was procured by law enforcement officers, as contrasted with civilians, but whether the identification is reliable." Dunnigan v. Keane, 137 F.3d 117, 128 (2d Cir.) (finding a photographic display impermissibly suggestive even though it was conducted by a private investigator and not the police), cert. denied, 525 U.S. 840 (1998); Raheem v. Kelly, 257 F.3d 122, 137 (2d Cir. 2001), cert. denied, 534 U.S. 1118 (2002) ("The purpose of excluding identifications that result from suggestive police procedures is not deterrence but rather the reduction of the likelihood of misidentification."); see also United States v. Bouthot, 878 F.2d 1506, 1516 (6th Cir. 1989) (finding an unarranged courthouse confrontation to be impermissibly suggestive: "Because the due process focus in the identification context is on the fairness of the trial and not exclusively on police deterrence, it follows that federal courts should scrutinize all suggestive identification procedures, not just those orchestrated by the police, to determine if they would sufficiently taint the trial so as to deprive the defendant of due process."); Thigpen v. Cory, 804 F.2d 893, 895 (6th Cir. 1986) ("[O]nly the effects of, rather than the causes for, pre-identification encounters should be determinative of whether the confrontations were unduly suggestive."), cert. denied, 482 U.S. 918 (1987); Green v. Loggins, 614 F.2d 219, 223 (9th Cir. 1980) (finding an inadvertent

37

encounter in a police station holding cell to be unnecessarily and impermissibly suggestive: "[A] court is obligated to review every pre-trial encounter, accidental or otherwise, in order to insure that the circumstances of the particular encounter have not been so suggestive as to undermine the reliability of the witness's subsequent identification.").[8]

## B. State Court Findings

Petitioner and his co-defendants first challenged the admissibility of the identification testimony well in advance of trial. The trial court held two pre-trial Wade hearings, and then re-opened Petitioner's Wade hearing after jury selection had begun. Clearly established federal law required the court to consider whether the procedures were unduly or unnecessarily suggestive. The trial court's finding that the two show-up encounters were not suggestive is contrary to clearly established federal law.

In Petitioner's first Wade hearing, on February 24-25, 1992, the trial court considered the second, official identification procedures arranged by the police for witnesses Ruiz and Pierre-Louis. In the procedure arranged for Pierre-Louis, three suspects were placed together inside a room, and the witnesses were individually

---

[8] Although some older federal cases permitted the introduction of identification testimony following suggestive procedures *because* they were not arranged by the police, see Greenfield v. Gunn, 556 F.2d 935 (9th Cir. 1977) (victims identified and detained the suspect before police arrived); Mock v. Rose, 472 F.2d 619 (6th Cir. 1972) (accidental confrontation in the police station hallway occurred when the police officers did not know the victim had arrived at the station), at the time of Petitioner's trial, federal courts had focused on the effects, rather than the causes, of suggestive encounters.

instructed to look through the one-way glass and asked if they recognized anybody.

The trial court considered only whether there was any "suggestion done on the part of

the police officers," and found that there was not. (Feb. 24-25 Tr. at 382.) Yet the

Supreme Court has held that one-on-one show-ups are inherently suggestive, because

they suggest to the witness that the subject is already suspected by the police. See

U.S. v. Wade, 388 U.S. 218, 234 (1967)(describing the show-up presentation in

Stovall: "It is hard to imagine a situation more clearly conveying the suggestion to the

witness that the one presented is believed guilty by the police.") Because the trial

court did not acknowledge that show-up procedures are inherently suggestive, the

court did not then consider whether it was *unnecessarily* or *unduly* suggestive.

Because the trial court did not find that the official identification procedure was

unduly suggestive, it made no inquiry at all into the reliability of Pierre-Louis' second

identification of Petitioner.

After trial had commenced, the trial court learned about the accidental

observation of Petitioner by Pierre-Louis at the precinct desk. At that time, the court

held a limited hearing regarding the circumstances of that first confrontation. The re-

opened Wade hearing consisted only of the testimony of Pierre-Louis. Defense

Counsel's request that the police officers in attendance be identified and called to

testify was denied. At the conclusion of this hearing, the trial court denied

Defendant's motion to suppress Pierre-Louis's identification testimony, apparently on

the grounds that the first confrontation was not arranged by the police and that Pierre-

39

Louis's identification at that moment was voluntary and spontaneous. (March 18 Tr. at 27-28.) Neither of these factors considered by the trial court comport with the Supreme Court's standard for assessing whether the procedure was "unnecessarily suggestive," <u>Stovall</u>, 388 U.S. at 302, or susceptible to "a very substantial likelihood of irreparable misidentification," <u>Simmons</u>, 390 U.S. at 384. Nor did the state court reconsider the earlier finding related to the officially-arranged show-up, in light of the possibility that the initial inadvertent encounter may have tainted the official show-up procedure that followed.

On direct appeal, the Appellate Division found that the trial court properly denied the motion to suppress Pierre-Louis's pre-trial identification, because "the record reveals that the witness's station-house viewing of the defendant was accidental, unarranged, not attributable to any misconduct on the part of the police, and not unduly suggestive." <u>Richardson</u>, 622 N.Y.S.2d at 967. Although Petitioner alerted the appellate court to the connection between the earlier unarranged show-up at the precinct desk and the subsequent officially arranged show-up in the viewing room (Ex. II, Def.'s App. Brief, at 35), the Appellate Division apparently did not consider the impact of the first unarranged confrontation on the subsequent official show-up. The Appellate Division did not explain its conclusion that the confrontation was "not unduly suggestive," and the New York state cases it cited focused on police misconduct. <u>People v. Magee</u>, 596 N.Y.S.2d 105 (N.Y. App. Div. 1993) ("The station house encounter between the defendant and his victim, during which the victim was

40

identified by the defendant (rather than the other way around), was accidental, was not a 'show-up' in the ordinary sense, and was clearly devoid of suggestiveness."); People v. Griffin, 593 N.Y.S.2d 466 (N.Y. App. Div. 1993) ("[T]he station house viewing of the defendant by a witness was accidental, unarranged, not attributable to any misconduct on the part of the police, and was not unduly suggestive.").[9]  The Appellate Division also did not reach the question of independent reliability of the identification.

Although the Appellate Division used the "unduly suggestive" language contained in the federal standard, the citation to these New York cases suggests that it meant something different by the term.  Established federal law holds that show-up

---

[9] The New York State courts' standard for excluding identification testimony only when deliberate police misconduct was involved does not follow the established federal standard. See, e.g., People v. Sims, 540 N.Y.S.2d 834, 836 (N.Y. App. Div. 1989) (finding no unnecessary suggestion where police were sorting through bar patrons who were all held in close proximity in holding cells in order to determine who were victims and who were perpetrators); People v. Musial, 501 N.Y.S.2d 913, 914 (App. Div. 1986) (permitting identification testimony following an accidental confrontation, where the suspect was handcuffed to a railing in the police station when a witness entered).  This different approach is illustrated by the proceedings in People v. Gonzalez, in which the witness was put into a room in the precinct where he could see the suspects through an open door, and the suspects were together and wearing handcuffs.  The trial court held a Wade hearing and found that the procedures were not unnecessarily suggestive or conducive to irreparable mistaken identification, because there was no suggestion that the police had planned the encounter.  See Gonzalez v. Hammock, 639 F.2d 844, 846 (2d Cir. 1981) (citing Petitioner's Brief at A5-6).  The Appellate Division affirmed, finding that the accidental observation of the handcuffed suspects "was not unduly suggestive" because "[t]he spontaneity of [the] identification, without any police prompting, certainly is evidence of the absence of any intentional untoward police conduct."  People v. Gonzalez, 403 N.Y.S.2d 514, 517 (App. Div., 1978) aff'd 416 N.Y.S.2d 239 (1979).  On habeas review, the federal district court rejected the state court's analysis and found that the accidental showup was both impermissibly suggestive and unreliable and granted the habeas petition on those grounds.  Gonzalez v. Hammock, 477 F. Supp. 730 (S.D.N.Y. 1979).  However, the Second Circuit reversed on appeal.  The appellate court acknowledged "the possible corrupting effect of any inadvertent suggestiveness at the police station," but found that the identification was nonetheless reliable.  Gonzalez v. Hammock, 639 F.2d 844, 848 (2d Cir. 1980).

41

procedures are inherently suggestive and require further inquiry into exigent circumstances and the independent reliability of the identification. The Appellate Division did not even reach the question of independent reliability. Accordingly, the Appellate Division reached a decision that was contrary to clearly established federal law.

## C. Application of Federal Law to the Facts of This Case

Petitioner argues that he was denied a fair trial because the trial court improperly admitted witness identification testimony that was the product of unduly suggestive identification procedures that caused the identification to be unreliable. Under established federal law, the first inquiry is whether the identification procedures were unnecessarily suggestive. This Court finds that the circumstances of Pierre-Louis's identification of plaintiff were suggestive. Pierre-Louis first identified petitioner during the inadvertent encounter as Pierre-Louis entered the precinct. At trial, he testified: "As I'm walking into the precinct, I observe three guys handcuffed. . . . I observed three guys handcuffed, and I said to the officer, the little guy, he's the one that – I recognize that little guy, he's the one that shot one of the fellow." (Tr. at 564.) This accidental show-up of the three suspects, all in handcuffs and surrounded by police officers, was clearly suggestive. See Stovall, 388 U.S. at 293. Richardson was at a particular disadvantage, here, because of his relative stature. At 5 feet, 5 inches, he was seven inches shorter than the other two. Such a significant height difference can be suggestive, where a suspect's height is unnecessarily contrasted with

42

that of others. See Foster v. California, 394 U.S. at 441-44 (line-up found to be unduly suggestive where defendant was placed with two other men who were six inches shorter).

Although there is no evidence that the initial confrontation was arranged by the police, little care was taken to arrange that such an inadvertent meeting should not happen. The police officers' carelessness in failing to prevent this encounter was then compounded by their decision to conduct the witness to the official show-up procedure, shortly after this initial encounter. At the reopened Wade hearing, the witness testified that he immediately told police officers that he recognized the suspect upon entering the precinct. However, the trial court refused Petitioner's request to call the police officers in order to determine if they made any effort to mitigate the impact of this initial, suggestive encounter. That next encounter, too, was inherently suggestive. The witness was presented with the same three suspects together, again with no fillers. This arrangement sent a clear message: the police officers already suspected these individuals.

Moreover, the procedures permitted and followed by the police in this case were *unnecessarily* suggestive. The first inadvertent encounter could have been avoided by coordinating the processing of the suspects and the arrival of the witnesses. Or mitigated afterward, by not immediately showing the same witness the same three suspects together in a room. The second show-up was also unnecessarily suggestive because there were no exigent circumstances precluding a lineup. This was not the

43

case where a showup could be considered necessary to immediately confirm the

identity of detained suspects or where the witness was at risk of dying. See Bautista,

23 F.3d at 730 ("prompt showing of a detained suspect at the scene of arrest has a very

valid function: to prevent the mistaken arrest of innocent persons"); Stovall, 388 U.S.

at 302 (showup procedure did not violate due process where sole eyewitness was at

risk of dying and unable to travel from hospital bed to police station). Petitioner was

already under arrest, so it was not the case that a quick show-up could have served to

exonerate an innocent suspect. Indeed, Pierre-Louis's failure to positively identify the

two other suspects did not result in their immediate release or exoneration: both

Hankins and Moore were indicted, Moore continued in custody until released on his

own recognizance following the first Wade hearing (Dec. 13-178 Tr. at 201), and both

remained as suspects until the charges against Moore were dropped or dismissed, and

Hankins was acquitted at trial.

Moreover, the eyewitnesses and Petitioner were already at the police station,

where viewing rooms and fillers were available for a lineup. In fact, that very same

night, another suspect, Finch, was placed into a lineup, and thereafter identified by

Pierre-Louis and other witnesses as the perpetrator who shot and killed Coleman.

There was no reason not to afford the same protection to Richardson.

Had the state courts applied clearly established federal law regarding the

suggestiveness of show-up identification procedures, they would have found these

procedures to be unduly suggestive. Then, the courts should have considered the

44

second prong of the inquiry and evaluated the reliability of the identification. Instead, the trial court never considered reliability, denied the suppression motion, and improperly admitted the testimony at trial. On appeal, the Appellate Division also found that the two consecutive show-ups, with no exigent circumstances, were not unduly suggestive. The appellate court also failed to evaluate the reliability of the identification testimony.

To determine whether a suggestive identification may be properly admitted at trial, under clearly established federal law, the Court must now consider whether the identification was nonetheless sufficiently reliable. Although the trial court did not reach the question of independent reliability, this Court has before it the record of the three Wade hearings and the trial testimony, sufficient bases to consider whether sufficient indicia of reliability supported the witness's identification of Petitioner. Using Manson's totality of the circumstances test, including the five factors set forth in Biggers, this Court finds that the identification is not independently reliable.

The first Biggers factor requires that the court consider the witness's opportunity to view the perpetrator at the time of the crime. The record in this case indicates that although it was nighttime, there was a streetlight overhead. According to Pierre-Louis's testimony, he saw three individuals approach and had a clear view of the faces of all three perpetrators. (Trial Tr. at 545.) He estimated that the entire incident took about two minutes, although Defense Counsel sought to challenge his estimate. (Id. at 575.) He remained in close proximity to the perpetrators during the

45

incident. This evidence suggests that the witness had sufficient opportunity to view the perpetrators.

The second <u>Biggers</u> inquiry considers the witness's degree of attention. Courts have not reached consensus on a "weapon focus effect" on eyewitness reliability, or on whether a victim's terror serves to focus or distract his or her attention. In <u>Gonzalez v. Hammock</u>, the Second Circuit suggested that "there is little doubt that [the witness's] attention would be riveted on a man who was pulling a shotgun from a bag." 639 F.2d at 847. More recently, in <u>Raheem v. Kelly</u>, that court found that "it is human nature for a person toward whom a gun is being pointed to focus his attention more on the gun than on the face of the person pointing it." 257 F.3d at 138. <u>See also</u> <u>Thigpen</u>, 804 F.2d at 897 (noting the effects of stress or excitement on the reliability of an identification).[10]

---

[10] The social scientific research supports the view that stress and fear blur concentration and memory, not sharpen it. <u>See</u>, <u>e.g.</u>, Charles A. Morgan, et al., <u>Accuracy of Eyewitness Memory for Persons Encountered During Exposure to Highly Intense Stress</u>, 27 Int'l J.L. & Psychiatry 265 (2004) (describing a field study of the effects of severe stress on eyewitness reliability using data collected from the interrogations of U.S. military personnel undergoing survival school training. The results demonstrate that for most of the subjects, eyewitness reliability was significantly worse in high (as opposed to low) stress interrogations: "[E]yewitness memory for persons encountered during events that are personally relevant, highly stressful, and realistic in nature may be subject to substantial error."); Nancy Mehrkens Steblay, <u>A Meta-analytic Review of the Weapon Focus Effect</u>, 16 Law & Hum. Behav. 413 (1992) (reviewing 19 research studies testing the theory that eyewitnesses will give central attention to a weapon during a crime, and finding that the presence of a weapon decreased the accuracy of eyewitness identifications). Federal courts have acknowledged this research. <u>See</u> <u>Smith v. Smith</u>, No. 02 Civ. 7308, 2003 WL 22290984, at *11 (S.D.N.Y. Sept. 29, 2003) ("Studies have indicated that a crime witness' attention will often be highly focused on the weapon being used in the crime (the barrel of a gun or the blade of a knife), resulting in a reduction in ability of the witness to remember other details of the crime (including the face of the assailant)."); <u>Kennaugh v. Miller</u>, 150 F. Supp. 2d 421, 435 (E.D.N.Y. 2001) (finding that the degree of the witness's attention did not support independent reliability of an identification because the witness had a gun pointed at her throughout the time that she viewed the perpetrator).

46

In this case, the testimony suggests minimal attention and focus. Pierre-Louis testified that prior to the hold-up, he did not notice the faces of any of the individuals gathered around the payphone. Once the crime commenced, he ducked a step or two away and was not one of the victims. He testified both that he was too frightened to move further away (Trial Tr. at 573) and that he was "relaxed" and "observing" (Trial Tr. at 577). He was unable to recall many physical characteristics of any of the perpetrators. He described the perpetrator who shot Coleman, whom he later identified as Finch, as tall and heavy-set and wearing a hood. (Tr. at 546-47.) Of the three perpetrators he described, he was initially approached by one of the two taller individuals, whom he described only as "same size as me." (Tr. at 552.) He described the third perpetrator as "a little fellow" and "young, young kid," but offered no other physical description. (Tr. at 549-50.) This description "matched" petitioner and many other potential suspects. Pierre-Louis also described two guns, "a big gun" and "a small gun." (Tr. at 557-58.) The Court cannot find, on the basis of this record, that Pierre-Louis's attention was sufficiently focused on the faces of the perpetrators, and thus this factor cuts against reliability.

The third <u>Biggers</u> factor does not support reliability. There is no evidence that Pierre-Louis gave any description of the suspects prior to the suggestive show-ups. Moreover, the only characteristics he mentioned, *after* the identification procedure, were the perpetrator's youth and short stature, both descriptions that are only relevant in relation to others. Indeed, the descriptions of the suspects were consistently given

47

in relation to each other. Both Pierre-Louis and Ruiz testified that two of the perpetrators were tall and one of them was short. (Trial Tr. at 380, 383, 385, 546, 550, 552.) Pierre-Louis testified that when he first observed the three suspects standing in the station, he recognized "the little guy." (March 18 Tr. at 9; Trial Tr. at 564.) When he was conducted to the officially-arranged show-up, he identified petitioner as "the smaller of the three individuals," according to Detective Creegan. (Feb. 24-25 at 329). At trial, Pierre-Louis testified that when he viewed individuals in a show-up he tentatively identified one person as the shooter (whom he later identified as Finch) and that "[t]hen I saw another fellow, which is a little guy, then I pinpoint, I said, yes that's him." (Trial Tr. at 566.) Although he described the other two suspects as "about the same [as me]" and "same size as me," (Trial Tr. at 546, 552) he never gave an estimated height for "the little guy."

Once the witnesses were confronted with suspects, in each of the suggestive procedures, petitioner "matched" the description: he was the shortest of the suspects and he was shorter than the witness. Officer Devine gave pedigree information about each of the suspects and indicated that the other co-defendants were six feet tall (Trial Tr. at 208-210, 258-259), whereas Richardson was described as 5 feet, 5 inches tall and 130 pounds (Trial Tr. at 209). There was no testimony regarding the description or relative size of the individual who failed to stop when commanded by the police and was never apprehended. Only Petitioner, of all of the individuals arrested that night and shown to the witnesses, could be described as short. Since any individual

48

who was *relatively* shorter than the witness and other suspects would match this description, the actual "match" to this description does not speak to the reliability of the identification.

As to the fourth <u>Biggers</u> factor, the witness demonstrated a high degree of certainty at both confrontations, voluntarily identifying Petitioner at the front desk show-up, and unequivocally describing him as the "little guy" who "shot the guy with the jewelry" at the official show-up. Although the degree of certainty remains a viable factor under the Supreme Court's reliability test, extensive scientific research has demonstrated no meaningful correlation between a witness's confidence in an identification and its accuracy. <u>See</u>, <u>e.g.</u>, Evan J. Mandery, <u>Due Process Considerations of In-court Identifications</u>, 60 Alb. L. Rev. 389, 418 (1996) (citing research studies indicating the lack of correlation between the certainty and accuracy of eyewitness identifications); Amy L. Bradfield, et. al., <u>The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy</u>, 87 J. Applied Psychol. 112 (2002) (finding that certainty and accuracy are controlled by different factors and that post-identification feedback confirming the identification tends to inflate the witness's certainty to a greater extent for inaccurate identifications than it does for accurate witnesses."); Steven Penrod & Brian Cutler, <u>Witness Confidence and Witness Accuracy: Assessing their Forensic Relation</u>, 1 Psychol. Pub. Pol'y & L. 817 (1995) (reporting numerous studies on several aspects of eyewitness confidence, identification accuracy, and the impact on

49

juries, and suggesting that the problems of eyewitness testimony, including the weak correlation between confidence and accuracy, could be addressed by admitting at trial expert testimony on the scientific literature involving the reliability of eyewitness testimony). Yet numerous research studies have demonstrated that eyewitness certainty has a strong impact on juries, which tend to give witness certainty disproportionate weight in evaluating witness credibility. See, e.g., Brian Cutler, et. al., Juror Sensitivity to Eyewitness Identification Evidence, 14 Law & Hum. Behav. 85 (1990).

Federal courts have also acknowledged these problems. In Simmons v. United States, the Supreme Court observed that, after viewing a single photograph, "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent line-up or courtroom identification." 390 U.S. at 383-84. The Second Circuit has said that a defendant's right to due process includes the "right to avoid having suggestive methods transform [an identification] that was only tentative into one that is positively certain." Solomon v. Smith, 645 F.2d 1179, 1185 (2d Cir. 1981). In Raheem v. Kelly, the Second Circuit directed that a habeas petition be granted where the petitioner had been convicted on the basis of a suggestive identification procedure. In that case, the witnesses' only prior description of the perpetrator was that he was wearing a black leather coat. In a subsequent lineup, each witness picked the only individual wearing a black leather coat. The Second Circuit held that "To the extent that [the witnesses]

50

exhibited certainty [in their later identification of petitioner], we find it difficult to

view that certainty as an indicator of reliability independent of the suggestive lineup,

given their lack of recollection as to any physical features of the shooter's face . . . .

Whatever their certainty, it was engendered by the suggestive element itself, the black

leather coat." Id. at 139. The Sixth Circuit has noted that "empirical evidence on

eyewitness identification undercuts the hypothesis that there is a strong correlation

between certainty and accuracy." Haliym v. Mitchell, 492 F.3d 680, 706 (6th Cir.

2007) (citing Edward Stein, The Admissibility of Eyewitness Testimony About

Cognitive Science Research on Eyewitness Identification, 2 L., Probability & Risk

295, 296 (2003) and Elizabeth Loftus & James Doyle, Eyewitness Testimony: Civil

and Criminal 67 (1997)); see also U.S. v. Rattler, 475 F.3d 408, 413 (D.C. Cir. 2007)

("Although the certainty factor has been subject to much criticism, [referencing studies

and secondary sources criticizing the certainty criteria], the Supreme Court has yet to

repudiate it."); Brownlee, 454 F.3d 131, 143 n.9 (3rd Cir. 2006) (citing studies showing

no meaningful correlation between confidence and accuracy).

    The final factor, the lapse of time between the crime and the confrontations,

weighs in favor of reliability, since only an hour or two elapsed.

    "None of these factors standing alone is dispositive of the existence of

independent reliability; instead, reliability is assessed 'in light of the totality of the

circumstances.'" Brisco, 565 F.3d at 89 (quoting Raheem, 257 F.3d at 135).

Moreover, the Court must weigh these factors against the "corrupting effect of the

51

suggestive confrontation." <u>Braithwaite</u>, 432 U.S. at 114; <u>see also</u> <u>Raheem</u>, 257 F.3d at 139 (finding that the witnesses' certainty "was engendered by the suggestive element itself"); <u>Dickerson v. Fogg</u>, 692 F.2d 238, 245-47 (2d Cir. 1982) (affirming the grant of a petition where the witness's vague initial description devalued other <u>Biggers</u> factors, where "considering that [the witness] did not describe [the defendant] in greater detail until after he viewed [the defendant] in the courtroom, his second specific description was unmistakably the product of the [suggestive] viewing, and questionably reliable as well.") In this case, the Court finds that the witness had sufficient *opportunity* to view the perpetrator and that little time elapsed prior to the identification procedures. On the other hand, the witness had limited *attention* on the perpetrators' physical characteristics and gave vague initial descriptions. Because the pair of confrontations were so suggestive, the witness's certainty of his identification is highly suspect.

Other circumstances of this case also cast grave doubt on the reliability of Pierre-Louis's testimony. First, Pierre-Louis's recollection that Petitioner was at the scene is corroborated by Petitioner's own testimony that he was present, raising the possibility that Petitioner's face and short stature were indeed familiar to the witnesses, if, as Petitioner claimed, he was one of the last people to arrive on the scene before the actual perpetrators approached.[11] This association may well have become

---

[11] Psychologists have suggested that this type of misidentification can occur as part of a process known as "unconscious transference," in which different memory images may be combined or confused "when an eyewitness, accurately recalling an innocent bystander at the scene of a crime,

52

fixed in the witness's mind when he viewed a short, young-looking suspect standing, in handcuffs and in close proximity to two other handcuffed suspects, at the precinct desk.[12]

Pierre-Louis's initial tentative and inaccurate identification of Moore as the perpetrator who shot Coleman underscores the likely influence of the suggestive procedures and casts doubt on the witness's overall credibility and reliability. Moore, like Petitioner, was seen fleeing the scene. He, too, was standing in handcuffs at the precinct desk and was sitting with two other suspects in the viewing room. Following these two suggestive encounters, Pierre-Louis initially identified Moore as one of the perpetrators. Later, in a properly staged, non-suggestive line-up proceeding, Pierre-Louis identified Finch as this gunman. The charges against one-time co-defendant Moore were apparently dismissed prior to trial. These circumstances support Petitioner's claim that the suggestiveness of the procedures contributed to unreliable identifications.

This Court finds that under the totality of these circumstances, the

---

incorrectly identifies that bystander as the perpetrator." 2 Fed. Cts. L. Rev. 1, 25 (2007), citing Timothy J. Perfect & Lucy J. Harris, Adult Age Differences in Unconscious Transference: Source Confusion or Identity Blending?, 31 Memory & Cognition 570 (2003), Christian A. Meissner, Self-Generated Misinformation: The Influence of Retrieval Processes in Verbal Overshadowing, 29 Memory & Cognition 176 (2001); J. Don Read, et. al., The Unconscious Transference Effect: Are Innocent Bystanders Ever Misidentified? 4 Applied Cognitive Psychol. 3 (1990).

[12] Ironically, the prosecutor argued in summation that Petitioner's admission that he was at the scene prior to the commencement of the crime made the identification less suggestive and supported the reliability of the eyewitnesses' identification. (Trial Tr. at 878, 885.)

identification of Petitioner by Pierre-Louis was both suggestive and unreliable. The trial court, had it correctly applied established federal law to the facts, should not have admitted Pierre-Louis's identification testimony and did so in error.

## D. Harmlessness

Having found that the trial court erred in admitting Pierre-Louis's identification testimony, this Court must now consider the materiality of the error, that is, whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). Even erroneously admitted and unreliable identification testimony may not warrant relief from the conviction if the error was harmless. Wray v. Johnson, 202 F.3d 515, 525 (2d Cir. 2000). In determining the materiality of the error, "the principal factors to be considered are the importance of the witness's wrongly admitted testimony, and the overall strength of the prosecution's case." Id., 202 F.3d at 526.

Applying these factors to this case, the Court finds that the case against Petitioner hinged on witness Pierre-Louis's testimony that Petitioner was the second gunman, who shot and robbed Ruiz. Petitioner's own testimony did not contest his presence at the scene of the crime, but claimed that he was an innocent bystander. Officer Devine testified that Petitioner was among a group of people running from the scene, but other testimony demonstrated that once the shooting started, everyone on the street corner fled the scene, including the fatally wounded Coleman. No physical evidence linked Petitioner to the robbery and shootings: there was no evidence that

54

Petitioner was wounded in any struggle, and the police never recovered a second gun or the chain and cash stolen from Ruiz and Lambert. (Trial Tr. at 217, 394.) Officer Devine testified that he observed Petitioner while he was running from the scene, that he did not see him discard any object during his flight, that Petitioner stopped when he heard the police command, and that no contraband was found on Petitioner's person when he was arrested. The lack of physical evidence and the inference that Petitioner had no opportunity to discard it tend to support Petitioner's version of events, rather than the State's version.

Had Pierre-Louis's testimony not been admitted, the sole remaining evidence placing Petitioner as one of the perpetrators of the crime is the testimony of witness Ruiz. Yet Ruiz's pre-trial identification of Petitioner was arguably even less reliable, as he made his identification in a one-on-one show-up, in a hospital, while he was enduring extreme pain and after he had been administered pain medication.[13] Furthermore, the jury may well have found Ruiz to be a less credible witness than Pierre-Louis. On several occasions, Ruiz was impeached with his grand jury testimony. His trial testimony regarding the direction of flight of Petitioner and the other defendants was inconsistent with the testimony of the other witnesses, including

---

[13] Petitioner does not challenge the admission of Ruiz's testimony. Although that identification was also made in the course of a highly suggestive procedure, the hospital show-up, shortly after commission of the crime, likely fell within a permissible exception to the general rule disfavoring one-on-one show-ups. In any case, Petitioner failed to exhaust this potential claim; accordingly, the Court does not consider whether this show-up was *unnecessarily* suggestive or unreliable or whether its admission was in error.

55

the police officers. And the jury clearly disregarded Ruiz's unconfirmed identification testimony that another of the defendants, Hankins, was also one of the perpetrators, as Hankins was acquitted.

"Eyewitness identification evidence has a powerful impact on juries. Juries seem most receptive to, and not inclined to discredit, testimony of a witness who states that he saw the defendant commit the crime." Watkins v. Sowders, 449 U.S. 341, 352 (1981); see also Kampshoff v. Smith, 698 F.2d 581, 585 (2d Cir. 1983) ("There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial.

. . . [W]hile juries may be led by their experience to believe their eyes, and, by inference, what they hear from those who have seen, that eyewitness testimony may sometimes be the least trustworthy means to identify the guilty."). In this case, where other evidence of guilt was minimal, the jury likely relied heavily on Pierre-Louis's identification testimony. Accordingly, this Court finds that the erroneously admitted eyewitness identification testimony was the crucial factor leading to Petitioner's conviction. The admission of Pierre-Louis's unreliable identification testimony against Petitioner was not harmless error.

The writ of habeas corpus is granted on this ground.

## IV. Ineffective Assistance of Appellate Counsel

Petitioner argues that Appellate Counsel was ineffective for failing to raise on appeal the issue of probable cause for arrest and for failing to object to non-record

56

references and to Footnote 31 in Respondent's appellate brief. Petitioner previously raised both of these claims in his state petition for a writ of error coram nobis. Richardson, 741 N.Y.S.2d 899. The state court denied the writ without comment. Accordingly, it is impossible to determine whether these claims were "adjudicated on the merits" and thus subject to AEDPA's more exacting standard of review. See 28 U.S.C. § 2254(d); Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir. 2003) ("Where it is impossible to discern the Appellate Division's conclusion on the relevant issue, a federal court should not give AEDPA deference to the state appellate court's ruling." (internal quotations and citations omitted)). In any case, these claims would be rejected on the merits even under the pre-AEDPA standard. See Messiah v. Duncan, 435 F.3d 186, 197 (2d Cir. 2006) ("We need not determine here whether [petitioner's] claims were adjudicated on the merits by the state courts, thereby triggering AEDPA review, because his claims would fail even if we apply the less deferential, pre-AEDPA standard.") Under this standard, the Court conducts a de novo review of petitioner's federal constitutional claim and may grant the claim if it finds that a constitutional violation has occurred.

The Sixth Amendment guarantees a defendant's right to counsel, including the right to effective counsel. The Supreme Court set forth the standard for evaluating the effectiveness of counsel in Strickland v. Washington. In order to successfully challenge a denial of the Sixth Amendment right to counsel, a petitioner must first show that counsel's performance "fell below an objective standard of reasonableness"

57

under "prevailing professional norms." 466 U.S. 668, 687-88 (1984). Additionally, the petitioner must establish that he was actually prejudiced by counsel's deficient performance, by showing that a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 687, 694. The Strickland standard also applies to the evaluation of appellate counsel. See Smith v. Murray, 477 U.S. 527, 536-37 (1986); Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992) ("[O]ur Circuit has also adopted the Strickland two-prong test in assessing the effectiveness of appellate counsel."). Appellate counsel is not required to bring every non-frivolous issue requested by the defendant. Jones v. Barnes, 463 U.S. at 754. In order to meet the first prong of Strickland, Petitioner must demonstrate that his appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Appellate Counsel raised three issues in Petitioner's direct appeal. Although these claims were ultimately unsuccessful on direct review, they presented colorable issues, which Petitioner continues to advance in collateral review, and which this Court now entertains. Omitting the other claims may well have been a sound strategic decision by Appellate Counsel.

In particular, the Court finds that Appellate Counsel was reasonable in not raising the

probable cause issue, since it was not preserved for appellate review.[14]

Appellate Counsel's failure to object to the non-record references and Footnote 31 in Respondent's appellate brief also may not serve as the basis for habeas relief. The appellate brief may have improperly included references to matters that do not appear in the official transcripts of the pre-trial proceedings. In Footnote 31, Respondent offered "to establish that after having passed the polygraph test, it was defendant, who, had in fact, refused the People's offer of a five to fifteen years sentence in return for a guilty plea to Robbery in the First Degree." (Respondent's Appellate Brief at 56 n.31.) However, given the account of the proceedings that did appear in the record, the Appellate Division need not have relied on this improperly included material in rejecting Petitioner's request for specific performance of the plea agreement. Accordingly, Counsel's failure to move to strike these references caused no prejudice to Petitioner.

For these reasons, the Court finds that Appellate Counsel acted within the bounds of reasonable professional competence. Petitioner's claims regarding the

---

[14] To the extent that Appellate Counsel could have alleged the ineffectiveness of Trial Counsel for failing to preserve this issue, the decision not to mount such a challenge was a reasonable strategic decision. Prior to trial, the trial court sua sponte raised a question regarding the probable cause to arrest co-defendant Hankins. The court noted that Hankins was arrested while sitting in the white Saab, some distance from the robbery and shootings and with no evidence that the police officers had seen him running from the scene of the crime. Accordingly, the court found that there was no probable cause for Hankins' arrest. (Dec. 13-17 Tr. at 197-200, 202.) More than likely, Petitioner's Trial Counsel did not raise a similar motion on behalf of Richardson because the circumstances of his arrest – where Detective Devine heard gunshots, observed Petitioner and others running, observed another suspect discarding a gun, commanded them to stop, and arrested Petitioner on the spot – were less susceptible to challenge.

alleged ineffectiveness of Appellate Counsel, standing alone, would not justify issuance of the writ. The writ is granted solely on the basis of the trial court error.

## CONCLUSION

Because this Court finds that Petitioner's right to a fair trial was violated when the trial court erroneously admitted unreliable identification evidence, the petition for a writ of habeas corpus is granted. Petitioner is ordered discharged from further custody, unless the state takes appropriate steps for retrial, without the use of the inadmissible identification testimony, within 60 days from entry of judgment. This order is stayed pending completion of an appeal, if any.

SO ORDERED.

S/SJ

Sterling Johnson, Jr., U.S.D.J.

DATED: August **3** , 2009
Brooklyn, New York

P-049